# **<u>EXHIBIT C</u>**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

In re:  Bare Arms Limited Liability Company
        Debtor

Case No. 25-10174
Chapter 11
Hon. Douglas L. Lutz

## DEBTOR'S SUPPLEMENTAL BRIEF REGARDING DEBTOR IN POSSESSION MONTHLY OPERATING REPORTS

Bare Arms Limited Liability Company ("Debtor"), by and through counsel, respectfully submits a supplemental brief regarding the Debtor in Possession Monthly Operating Reports contemporaneously filed as ECF Nos.166, 167, 168, and 169.

1. The instant case was filed on July 21, 2025.

2. Beginning on August 13, 2025, Debtor and Burke and Herbert Bank and Trust Company ("B&H") entered into various agreed interim orders on the use of cash collateral. (The "Cash Collateral Orders;" ECF No. 82, 99, 125, and 135)

3. Pursuant to the most recent Cash Collateral Order [EFC no. 135], B&H reserved the right to terminate Debtor's authorization to use cash collateral upon the occurrence or non-occurrence of certain conditions enumerated in the order.  ("Termination Event(s)").

4. On November 12, 2025, the United States Trustee filed the Motion of the United States Trustee to Convert or Dismiss Case (the "Motion to Convert or Dismiss"). [ECF No. 137].

5. As grounds for dismissal, the United States Trustee states that the Debtor's corporate representative, William Bare, withdrew $188,703.40 in cash from the Debtor's business in August and September of 2025. The United States Trustee also states that William Bare inappropriately expended additional estate resources for personal expenses and filed grossly inaccurate monthly operating reports.

6. On November 14, 2025, this Court set an evidentiary hearing on the UST Motion. [ECF No. 142]

7. On November 24, 2025, B&H notified Debtor that it was terminating Debtor's right to use cash collateral because of the occurrence of various Termination Events.

8. By November 29, 2025, The United States Trustee, B&H, and Debtor agreed to the dismissal of the case. [ECF no. 157].

9. A hearing was held on December 10, 2025, and the Court continued the hearing to December 19, 2025.  [ECF No. 164].

10. Undersigned counsel has carefully reviewed the company records, reconciled all digital records with bank accounts statements, verified the entries with the Debtor's corporate representative, to address the concerns raised in the U.S. Trustee's Motion and at the December 10, 2025, hearing.

11. Debtor has contemporaneously filed Amended Monthly Operating Reports ("Amended MORS" for August 2025 and September 2025. The belated MOR for October and November 2025 MOR have also been filed.

12. The following is intended to provide background information that could aid in the reading and comprehension of the MORS and related exhibits, and of the method used to report the information.

## A. Point of Sale and Deposits.

13. Debtor operates two distinct revenue streams: a restaurant and a gun range. Each operation utilizes its own point-of-sale ("POS") system to record sales activity.

14. The restaurant and the gun range each process sales through merchant accounts, with proceeds deposited into Bare Arms' deposit accounts. QuickBooks records revenue based on the amounts actually deposited into the bank accounts.

15. Approximately 90% of restaurant sales are paid with credit cards. Approximately 95% of gun range sales are non-cash transactions.

16. Bare Arms acts as a pass-through for customer tips, which are paid out nightly to restaurant employees. To the extent cash is received from either the restaurant or the gun range, it is typically used to fund tips earned by restaurant employees. Tips may account for up to 25% of the gross sales reflected in the restaurant POS reports.

17. The Restaurant POS sales reports also include amounts attributable to third-party delivery services, including Grubhub and DoorDash ("Third-Party Delivery Services" or "TPDS"). TPDS fees are approximately 30% of TPDS generated gross sales. Third-party delivery services deduct their fees from gross sales prior to depositing funds into Debtor's bank accounts.

18. Gun range POS reports reflect gross transaction amounts that exceed the corresponding bank deposits and QuickBooks entries due to the manner in which consignments, trade-ins, and layaway transactions are recorded.

19. Consignment firearm sales are recorded in the POS system at the full sale price, although Debtor retains only approximately 20% of the proceeds, with the balance remitted to the consigning owner. Trade-in transactions are likewise recorded at the full sales price, with the customer's trade-in reflected as a cash-equivalent credit applied toward the purchase.

20. Layaway transactions are recorded in the POS system at the entire purchase price, even though only approximately 30% of the price is deposited with Debtor at the time of the transaction.

21. As a result, gun range POS sales totals exceed the amounts actually deposited into Debtor's bank accounts and recorded in QuickBooks.

22. The combined effect of tips (approximately 20–25% of gross sales as reflected in POS reports), third-party delivery service fees (approximately 30% of gross sales generated from TPDS), and the treatment of consignments, trade-ins, and layaways accounts for the difference between POS sales figures and the amounts reflected in the bank accounts and QuickBooks. Debtor

cannot readily access records or reports that would permit a meaningful item-by-item reconciliation of these differences, and undersigned counsel was unable to undertake such an analysis.

23. POS Reports are attached to the MORs for August, September, October, and November 2025.

## B. Deposit Accounts.

24. In Debtor's prior Chapter 11 case (the "First Case"), the Court authorized Debtor to dispense with the United States Trustee ("U.S.T.") requirement to open debtor-in-possession accounts with an authorized depository and to instead open and maintain three debtor-in-possession deposit accounts with Citizens Bank ending in 8119, 8127, and 8192 (the "Citizens DIP Accounts").

25. The First Case was voluntarily dismissed on October 31, 2023. Debtor continued to maintain the Citizens DIP Accounts following dismissal of the First Case.

26. At some point thereafter, Debtor also opened a deposit account ending in 6975 with Burke & Herbert Bank & Trust Company ("B&H").

27. In connection with the present Chapter 11 case, August 11, 2025, Debtor opened three deposit accounts with B&H, each expressly designated as a debtor-in-possession account and identified as follows:

   (a) B&H DIP Operating Account. OPERATING – DEBTOR IN POSSESSION BK 25-10174-DLL" (Account ending in 5091)

   (b) B&H DIP Payroll Account — "PAYROLL – DEBTOR IN POSSESSION BK 25-10174-DLL" (Account ending in 5105); and

   (c) B&H DIP Tax Account — "TAXES – DEBTOR IN POSSESSION BK 25-10174-DLL" (Account ending in 5113).

28. On November 20, 2025, the Court entered an order granting Debtor's motion to dispense with the U.S.T. requirement to utilize an authorized depository and expressly authorizing Debtor, for the duration of the present case, to utilize the B&H DIP Operating Account (ending in 5091), the B&H DIP Payroll Account (ending in 5105), and the B&H DIP Tax Account (ending in 5113) (collectively, the "B&H DIP Accounts").

29. All bank statements for accounts that remained open during the applicable reporting periods are attached to Debtor's Monthly Operating Reports ("MORs").

30. The B&H deposit account ending in 6975 has been out of use since September 2025 and was not closed by B&H due to the existence of a negative balance. The MORs for October and November do not include the negative balance in the account ending in 6975.

## C. Cash Management and Intercompany Transfers.

31. Prior to the petition date, Bare Arms managed periodic cash shortfalls by receiving cash contributions from non-filing affiliated entities. Those contributions, in turn, created cash

shortfalls at the non-filing affiliates. When necessary, Bare Arms transferred funds back to the non-filing entities to address those shortfalls. This practice continued after the petition date.

32. Postpetition transfers between Bare Arms and non-filing affiliated entities are reflected as "Transfers from Non-Filing Affiliates" and "Transfers to Non-Filing Affiliates" in the Statement of Cash Flows attached hereto. The Statement of Cash Flows identifies both inbound and outbound transfers during the reporting period. For the period July 21, 2025, through November 30, 2025, the Statement of Cash Flows reflects net contributions of $60,988.95, which accounts for $338,717.34 of contributions by from non-filing affiliates to the Debtor, and $277,728.39 in transfers from the Debtor to the non-filing affiliates.

33. A Statement of Cash Flows for the full reporting period is attached as Exhibit 1.

**D. Journal Entries Reconciling Bank Statements and QuickBooks**

34. To prepare the Amended MORs and the MORs, Debtor recorded a limited number of journal entries in QuickBooks to reconcile differences between bank statements and QuickBooks records, for the period of July 21, 2025, through November 30, 2025.

35. These journal entries fall into three categories:

    (a) Prepetition Opening Balance Adjustments. Journal entries were made to establish the prepetition opening balance for the Citizens operating account ending in 8127, where a discrepancy existed between the bank statements and the QuickBooks records.

    (b) Miscellaneous Cash Income Adjustments. Journal entries were recorded to reflect deposits of miscellaneous cash not otherwise captured through merchant processing.

    (c) Miscellaneous Cash Expense Adjustments Journal entries were recorded to account for cash expenses and reconciliation differences necessary to align net cash flow with ending bank balances.

36. In the aggregate, journal entries recorded during the reporting period totaled $18,765.87. A summary of these journal entries is attached as Exhibit 2.

**E. The Monthly Operating Reports.**

37. Debtor has contemporaneously filed Amended Monthly Operating Reports for August 2025 and September 2025. The belated MOR for October and November 2025 MOR have also been filed. Debtor has not amended the first report for the period starting on July 21, 2025 through July 31, 2025.

38. The intercompany transfers are not counted for as income for the purposes of MORs because their inclusion would drastically skew the normal operating measures. Instead, the amounts are accounted for in the opening balance of each MORs. A statement of cash flows that shows the intercompany transfers is attached to each MOR.

39. Likewise, adequate protection payments and carve-outs for attorney fees and for the Subchapter V Trustee are included in the cash flow statement rather than as disbursements. (See Exhibit 1).

40. When working through the MORs, Debtor also discovered that a series of fraudulent checks had been draw against the B&H account ending in 6975. B&H has been conducting an investigation into the matter, and there is some hope that the $4,998.00 that was stolen from Debtor's account could be recovered. The fraudulent checks are accounted for in the other income report attached as Exhibit 3.

**F. Current status.**

41. For the period July 21, 2025, through November 30, 2025, Debtor incurred a net operating loss of $54,014.03, as reflected in the Profit and Loss statement included as Exhibit 4.

42. These losses were covered by cash contributions from non-filing affiliated entities.

43. Debtor does not expect to recover from the protracted decline in business revenues. Nor does it have sufficient liquidity to purchase inventory necessary to generate increased sales, or a meaningful marketing budget. In short, Debtor is not likely to reorganize.

44. Debtor intends to cease operations on January 1, 2026, which will allow approximately 23 employees to remain employed through the holiday season and will give the employees time to seek alternative employment in the new year.

45. Debtor also requires time to wind down gun range operations in compliance with Federal Firearms License ("FFL") requirements, including arranging for the lawful transfer or disposition of firearms and ammunition inventory through a properly licensed FFL dealer. Debtor cannot securely maintain gun-related inventory at the premises in the absence of ongoing operations.

46. Debtor will seek to return firearms held on consignment and to resolve outstanding layaway transactions, by among other approaches, transferring such items to a licensed FFL dealer as required by applicable regulations.

47. As reflected in the Agreed Order Dismissing Case, the Debtor, the United States Trustee, and Burke & Herbert Bank and Trust Company ("B&H") consented to dismissal of this case following the termination of Debtor's authority to use cash collateral and the Debtor's inability to continue operations without such authority.

48. Upon entry of the consent order, Debtor acknowledges that it should have continued to develop the evidentiary record, corrected and amended erroneous Monthly Operating Reports, and more fully briefed the Court on the issues raised in connection with dismissal. Undersigned counsel incorrectly assumed that further work was unnecessary once the United States Trustee, B&H, and the Debtor had agreed to dismissal, and once all parties had ceased preparing for the scheduled evidentiary hearing.

49. This supplemental brief is submitted to address the Court's concerns and to provide a complete and accurate factual record in support of dismissal by consent.

50. Attached as Exhibit 5 is the Declaration of Mr. William H. Bare the corporate representative for the Debtor.

Respectfully,

*/s/ J. Christian A. Dennery*
J. Christian Dennery, Esq.
Dennery, PLLC
PO Box 121241
Covington, KY 41012
Ph: 859-692-3685
Fx: 859-286-6726
jcdennery@dennerypllc.com
Counsel for Debtor

## CERTIFCATE OF SERVICE

I certify that the foregoing motion was served on all parties registered to receive electronic notices through the Court CM/ECF system.

*/s/ J. Christian A. Dennery*